## In re Michael CHERWENKA, Debtor.

### Res–Ga Gold, LLC and Jason L. Pettie, Chapter 7 Trustee for the Estate of Michael Cherwenka, Movants,

v.

### Michael Cherwenka, Respondent.

### No. 13–57592–MGD.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed March 6, 2014.

---

Edward F. Danowitz, Jr., Danowitz & Associates, P.C., Atlanta, GA, David W. Gordon, William A. Rountree, Macey, Wilensky & Hennings, LLC, Atlanta, GA, for Debtor.

Jason L. Pettie, Decatur, GA, Trustee.

### ORDER SUSTAINING IN PART AND OVERRULING IN PART OBJECTIONS TO DEBTOR'S EXEMPTIONS

MARY GRACE DIEHL, Bankruptcy Judge.

This matter involves objections to Debtor's claim of exemptions in an individual retirement account ("IRA") and an annuity. Based upon the applicable Georgia exemption statutes and the qualifying requirements under the Internal Revenue Code, Debtor is entitled to exempt the IRA but not the annuity.

An evidentiary hearing was held on September 30, 2013. Res–Ga Gold, LLC ("RES–GA") moved to disallow two of Debtor's (amended)[1] claimed exemptions: an IRA held by Pensco Trust Company with a scheduled value of $212,961.00 ("Pensco IRA") and an annuity titled AXA Equitable Policy with a scheduled value of $440,743.00 (the "Annuity"). (Docket Nos. 22 & 70). The Chapter 7 Trustee joins in RES–GA's objection to the Annuity exemption. (Docket No. 56). Debtor's amended Schedule C claims the Pensco IRA and Annuity as exempt under section 44–13–100(a)(2.1)(D) of the Georgia Code. (Docket No. 42).

At the evidentiary hearing on these matters, Edward Danowitz represented Debt-

---

**1.** Debtor's original exemptions listed the IRA with a value of $158,845.00 and claimed the exemption under O.C.G.A. § 44–13– 100(a)(2)(F) and the Annuity (for the same amount) was claimed under O.C.G.A. § 44–13–100(a)(2)(E).

or and Allen Buckley appeared on behalf of Debtor as he made closing argument. David Klein represented Movant RES–GA. Jason Pettie, the Chapter 7 Trustee, also appeared at the hearing.

At the beginning of the hearing, the Court heard argument regarding two Motions in Limine (Docket Nos. 81 & 85). Debtor's Motion in Limine sought to limit evidence to the prepetition period. Debtor's motion was orally granted over RES–GA's opposition, and evidence taken at the hearing was limited to the relevant prepetition period. RES–GA's Motion in Limine sought to exclude the testimony of Debtor's expert witness, Allen Buckley, Esq. (Docket No. 85), and this motion was also orally granted at the start of the hearing. Mr. Buckley was permitted to make a closing argument for Debtor.

After the close of evidence and argument, the Court took the matter under advisement. The Court permitted the parties to file post-hearing briefs (Docket Nos. 87, 92, 94 [2], 96 & 97). RES–GA also filed a motion to strike the brief of Mr. Buckley in support of Debtor's claimed exemptions (Docket No. 100). The Court has considered all the parties' papers and, although the brief filed by Mr. Buckley purports to be filed as an amicus curie brief, Mr. Buckley's appearance at the hearing on behalf of Debtor belies this title.[3] Nonetheless, there is no reason to strike the paper. Accordingly, RES–GA's Motion to Strike is denied. Additionally, RES–GA filed a Motion for Summary Judgment just days before this evidentiary hearing was held on the same issues.

(Docket No. 80). In view of this Order, RES–GA's motion for summary judgment is denied as moot.

 This is a core proceeding. Under 28 U.S.C. § 1334(d) and 28 U.S.C. § 157(b)(2)(B), this Court has the power to make a final binding determination concerning a dispute which involves a challenge of a claim of exemption asserted by the Debtor. *E.g., In re Hughes,* 293 B.R. 528, 530 (Bankr.M.D.Fla.2003).

## FINDINGS OF FACTS

At the time of the evidentiary hearing, Debtor was 50 years old. Debtor has long been in the business of "flipping" houses, which entails purchasing real property and then selling the properties for profit. Debtor owns and operated through a company named Goldmine Properties, Inc. ("GPI") that was incorporated in 1996 or 1997. GPI operated at a profit until the nationwide real estate crash in 2008. GPI performed especially well during the early 2000s. The success of GPI led Debtor to consult a financial advisor, Kevin Ferguson, who assisted Debtor with retirement planning, including establishing the Pensco IRA and the Annuity in 2003.

Debtor now claims an exemption in the IRA held by Pensco Trust Company. Debtor's Pensco IRA is a self-directed IRA, and the Pensco IRA's assets include real property. Debtor also claims an exemption in the Annuity, an "AXA Accumulator Plus Annuity (NQ)" held by AXA Equitable Life Insurance Company.

**2.** Res–GA asserts a new legal theory regarding the IRA and attaches exhibits to its post-hearing paper at Docket No. 94. The Court is unable to consider the attachments as evidence in this posture and form. Further, the exhibits themselves present information that is not conclusive as to RES–GA's theory. Any determination based upon these exhibits re-

quires the Court to improperly speculate as to the source of the funds. Additionally, based upon the paper it does not appear that this is newly discovered evidence since RES–GA notes that the attached exhibits were produced by Debtor on July 25, 2013.

**3.** Bankruptcy Local Rule 9010–4, N.D. Ga.

## A. Pensco IRA

The self-directed form of Debtor's Pensco IRA allows Debtor to invest in distressed real properties and have the IRA realize profit from the later sale of these properties. Debtor has expertise in the area of identifying, purchasing and reselling distressed residential properties. Debtor locates the real estate to serve as the investment for the self-directed Pensco IRA, and Pensco has an authorization process with a right to decline Debtor's request for purchase. A real estate agent works with Debtor to submit a proposed offer to Pensco. A representative from Pensco executes all the sale documents and the property is owned by "Pensco Trust Company FBO Michael Cherwenka." Debtor reviews the closing statements and communicates with Pensco in instances where there are discrepancies in fees or other figures on the HUD–1 or related documents. Although Pensco has authority to decline a proposed purchase, Debtor testified that has never occurred.

After a property is purchased, the property is resold. Any and all profits from the sale of any Pensco IRA asset are realized exclusively by the Pensco IRA. Sometimes the properties would be renovated or improved before sale. Sometimes the properties would simply be held and sold at a later date, hopefully capitalizing on advantageous market conditions or market swings. It is unclear whether the decision to improve a property and to what extent the properties were improved was made by Debtor or a contractor he regularly engaged. Debtor identified Casave Tamande of CMT Contractors and James Prichard of James Prichard Roofing as the lead contractors, project coordinators, or as Debtor's "team."

Debtor was not compensated for any real property research he performed, nor was he compensated for any recommendations, management or consulting services he provided relating to how the Pensco IRA properties were improved before resale. Debtor explained his role in buying and selling of these properties as being limited to identifying the asset for purchase and later selling the asset. Debtor engages his contractors to decide or oversee the scope of work with improved properties. Debtor testified that he "read and approved" the expense forms prior to Pensco paying funds to reimburse the submitted expenses. Contractors were paid by the job, which accounted for labor costs, but no management fee or additional cost was included in the expenses submitted to Pensco. Debtor stated he would inspect or confirm that work was completed through site visits or communication with his "team" before he would approve expenses to be paid by Pensco.

Debtor stated that he has never jointly owned a property with Pensco. Yet, he also testified that 131 Shyrewood Road in Lawrenceville was owned in part by Pensco and in part by him personally. Debtor recollected that he owned 55% of the property with the remaining 45% owned by the Pensco IRA. Debtor also stated that at the sale of this particular property RES–GA received over $75,000.00 to deliver clear title to the purchaser.

Debtor created Prosperity Homes for All, LLC in 2009 or 2010 when judgments against Debtor's long-time company, GPI, were being enforced by RES–GA. Debtor wholly owns Prosperity Homes for All, LLC. Debtor ceased operating GPI, in part, because of the judgment liens, charging lien, seizures and garnishments. Debtor was also subject to personal garnishments as a result of a judgment related to a personal guarantee.

Debtor testified that his daughter never visited any of the IRA-owned properties,

nor did she do any work for these properties.

Debtor has made several premature withdrawals from the Pensco IRA. In 2012, Debtor withdrew $70,000.00. There were two additional prepetition distributions in January of 2013 in the respective amounts of $20,000.00 and $10,000.00. The I.R.S. penalty tax was paid on the distributions, according to Debtor's tax returns, and the funds were used for living expenses, including Debtor's car payment on a 2010 Jaguar in the amount of $1,300.00 per month and a mortgage payment in the approximate amount of $3,300.00 per month. Debtor also contributed $1,000.00 per month to his church and paid his secretary's salary, which ranged from $80 to $600 per month, with these premature distribution funds. Debtor could effectuate the early withdrawals through an online request process, which he did. The Pensco IRA has no authority to refuse a requested withdrawal when funds are available.

Debtor was unsure into what bank account the premature distributions were transferred, yet he presumed since his personal accounts were being garnished during this time, that the withdrawn funds were likely deposited into an account for Prosperity for All Homes, LLC. Documentary evidence confirmed that the $20,000.00 withdrawal in 2013 was transferred to a Prosperity for All Homes, LLC's account.

### B. Annuity

In 2003, Debtor also obtained an "Accumulator Plus (NQ)" certificate, which was a combination of a fixed and variable deferred annuity (the "Annuity"). The certificate was issued and held by AXA Equitable. The certificate included a contract date of July 16, 2003. Debtor made two contributions in the amounts of $250,000.00

and $100,000.00 in July and October of 2003, respectively. No further contributions have been made to the Annuity and no withdrawals have been made. Debtor explained that he created the Annuity as a retirement vehicle because he was self-employed, and he was advised that this type of product could provide him "support payments" upon retirement.

Kevin Ferguson, a certified financial planner, principal of Your Wealth Partners, and an affiliate of AXA Advisors since 2001, testified at the evidentiary hearing. Mr. Ferguson assisted Debtor with the selection of this Annuity product. Mr. Ferguson explained that the Annuity provides Debtor with a stream of income at Debtor's election. He explained that this was part of the retirement strategy he worked on with Debtor and that he suggested this product "predominantly due to the limits that he could make in a qualified plan." Mr. Ferguson testified, "A self-directed IRA has capital contributions limits currently of $6,000.00 a year." Mr. Ferguson also explained that Debtor's contributions to the Annuity were after-tax dollars.

This Annuity product allows Debtor to later make an election as to when the payment stream commences. Debtor can start the payment stream at any time, but there are tax provisions that would create taxation and penalty prior to the age of 59½. The commencement date obviously affects the periodic draw amount. There are also riders on the Annuity that could affect the income stream. The terms of the Annuity do not prohibit Debtor from making early withdrawals in any amount.

Mr. Ferguson characterized the Annuity as an annuity contract, not a life insurance contract. However, he noted that Debtor selected a death benefits rider for this Annuity. At the hearing, Mr. Ferguson testified that the current cash value was

$472,000 and the guaranteed minimum death benefit was valued at $646,000. The terms of the death benefit rider permit Debtor to change the beneficiary at any time.

## CONCLUSIONS OF LAW

 When a debtor files a bankruptcy petition, "all legal or equitable interest of the debtor in property" becomes property of the bankruptcy estate subject to claims by creditors. 11 U.S.C. § 541(a)(1). However, to provide a debtor with a fresh start after bankruptcy, the Bankruptcy Code allows certain interests in property to be exempt from the bankruptcy estate. Given that these exemptions are a fundamental component of a debtor's fresh start, they are construed liberally and the objecting party bears the burden of proof to show that an exemption has not been properly claimed. FED. R. BANKR. P. 4003(c). Thus, RES–GA and Trustee must establish that Debtor's claim of exemption as to the IRA and Annuity are improper.

Under Section 522(b) of the Bankruptcy Code, Congress provided that states could elect to "opt out" of the federal exemption scheme. Since Georgia is an "opt out" state, Georgia law governs the issue before this Court as to whether Debtor's interest in the IRA and Annuity are exempt. Debtor claims exemptions in both the IRA and Annuity under Section 44–13–100(a)(2.1)(D) of the Georgia Code, which provides:

> (a) In lieu of the exemption provided in *Code Section 44–13–1*, any debtor who is a natural person may exempt, pursuant to this article, for purposes of bankruptcy, the following property:
>
> > (2.1) The debtor's aggregate interest in any funds or property held on behalf of the debtor, and not yet distributed to the debtor, under any retirement or pension plan or system:

> . . .
>
> > (D) An individual retirement account within the meaning *Title 26 U.S.C. Section 408.*

O.C.G.A. §§ 44–13–100(a)(2.1)(D).

Debtor claims that the Pensco IRA and the Annuity are exempt under section 44–13–100(a)(2.1)(D) of the Georgia statute because the Pensco IRA and Annuity qualify under section 408 of the Internal Revenue Code.

### A. Debtor is entitled to exempt the Pensco IRA because it is a qualifying "individual retirement account" within the meaning Title 26 U.S.C. Section 408.

RES–GA's objection to Debtor's Pensco IRA exemption is based on the theory that Debtor has engaged in prohibited transactions, as provided by 26 U.S.C. § 4975, which disqualifies the IRA as an individual retirement account under section 408. If the IRA is disqualified under section 408, then the claimed exemption is not longer available to Debtor under section 44–13–100(a)(2.1)(D) of the Georgia Code.

Section 408 of the Internal Revenue Code is entitled "Individual Retirement Accounts," and section 408(a) reads:

> (a) Individual retirement account
>
> For purposes of this section, the term "individual retirement account" means a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:
>
> (1) Except in the case of a rollover contribution described in subsection (d)(3) in [1] section 402(c), 403(a)(4), 403(b)(8), or 457(e)(16), no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable

year on behalf of any individual in excess of the amount in effect for such taxable year under section 219(b)(1)(A).

(2) The trustee is a bank (as defined in subsection (n)) or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.

(3) No part of the trust funds will be invested in life insurance contracts.

(4) The interest of an individual in the balance in his account is nonforfeitable.

(5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.

(6) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.

26 U.S.C. § 408(a). In addition to the requirements for an individual retirement account under section 408(a), an account ceases to be an individual retirement account if the beneficiary engages in any transaction prohibited by section 4975 of the Internal Revenue Code. 26 U.S.C. § 408(e)(2)(A)[4]. The following is the list of prohibited transactions under section 4975 of the Internal Revenue Code:

(c) Prohibited transaction

(1) General rule

For purposes of this section, the term "prohibited transaction" means any direct or indirect—

(A) sale or exchange, or leasing, of any property between a plan and a disqualified person;

(B) lending of money or other extension of credit between a plan and a disqualified person;

(C) furnishing of goods, services, or facilities between a plan and a disqualified person;

(D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;

(E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interests or for his own account; or

(F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

26 U.S.C. § 4975(c)(1)(A)–(F). The parties agree that Debtor is a fiduciary and, therefore, a disqualified person under § 4975(e).[5]

---

**4.** (2) Loss of exemption of account where employee engages in prohibited transaction

(A) In general

If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. For purposes of this paragraph—

(i) the individual for whose benefit any account was established is treated as the creator of such account, and

(ii) the separate account for any individual within an individual retirement account maintained by an employer or association of employees is treated as a separate individual retirement account.

**5.** Section 4975(e) provides: (2) Disqualified person.—For purposes of this section, the term "disqualified person" means a person who is—

(A) a fiduciary;

RES–GA has failed to meet its burden in proving that Debtor engaged in any prohibited transactions. Therefore, there is an insufficient basis to determine that Debtor's Pensco IRA is disqualified under section 408 of the Internal Revenue Code.

■ RES–GA first argues that Debtor performed work on the properties by researching and identifying the subject properties, appointing and approving work on the properties, and overseeing payment from Pensco for such work. RES–GA asserts these acts constitute prohibited transactions under section 4975(c)(1)(C) as direct and indirect services between Pensco and Debtor—an undisputed disqualified person. Although RES–GA insists that the statutory language is clear and Debtor's action categorically fit within the list of prohibited transactions, RES–GA's

position requires the Court to read out of the statute the word "transaction." There is no evidence that Debtor engaged in any transaction. A transaction includes an exchange of goods or services [6], the evidentiary record does not include that Debtor received anything in exchange for his alleged services. In fact, Debtor's testimony included that he received no money, discount, or other benefit for the identified activities he undertook with the Pensco IRA.

"Self-directed IRAs are authorized by federal law and are held by a trustee or custodian that permits investment in a broader set of assets than is permitted by traditional IRA custodians." *Levine v. Entrust Grp., Inc.*, 2012 WL 6087399 (N.D.Cal. Dec. 6, 2012). By its very na-

(B) a person providing services to the plan;
(C) an employer any of whose employees are covered by the plan;
(D) an employee organization any of whose members are covered by the plan;
(E) an owner, direct or indirect, of 50 percent or more of—
(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of a corporation,
(ii) the capital interest or the profits interest of a partnership, or
(iii) the beneficial interest of a trust or unincorporated enterprise, which is an employer or an employee organization described in subparagraph (C) or (D);
(F) a member of the family (as defined in paragraph (6)) of any individual described in subparagraph (A), (B), (C), or (E);
(G) a corporation, partnership, or trust or estate of which (or in which) 50 percent or more of—
(i) the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock of such corporation,
(ii) the capital interest or profits interest of such partnership, or
(iii) the beneficial interest of such trust or estate, is owned directly or indirectly, or held by persons described in subparagraph (A), (B), (C), (D), or (E);

(H) an officer, director (or an individual having powers or responsibilities similar to those of officers or directors), a 10 percent or more shareholder, or a highly compensated employee (earning 10 percent or more of the yearly wages of an employer) of a person described in subparagraph (C), (D), (E), or (G); or
(I) a 10 percent or more (in capital or profits) partner or joint venturer of a person described in subparagraph (C), (D), (E), or (G). The Secretary, after consultation and coordination with the Secretary of Labor or his delegate, may by regulation prescribe a percentage lower than 50 percent for subparagraphs (E) and (G) and lower than 10 percent for subparagraphs (H) and (I).

6. *Transaction Definition*, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/transaction (last visited Feb. 28, 2014); *see Rollins v. Commissioner*, 2004 T.C.M. (RIA) ¶ 2004–260 at *5 (explaining that " '[p]rohibited transaction' was defined as any of certain types of transactions between the entity and certain related persons; the types of transactions involved case-by-case analyses of arm's-length standards—determinations of reasonableness, adequacy, or preferential basis. Sec. 503(c).").

ture, Debtor, as IRA owner, is required to make decisions regarding the Pensco IRA's assets and investments. Essentially, Debtor's decision-making regarding asset acquisition and sale is characterized by RESGA as a prohibited transaction under section 4975(c)(1)(C)—as a service between a plan (Pensco IRA) and a disqualified person (Debtor). However, the recognition of self-directed IRAs as qualified IRAs, necessarily implies that a disqualified person (the owner as fiduciary) will make investment decisions regarding the plan. RES–GA has failed to establish sufficient evidence that Debtor received any personal benefit besides asset appreciation of those properties held by the Pensco IRA. There is no evidence to support a determination that Debtor's selection of real estate and any other decisions or recommendations regarding the IRA-owned properties resulted in any benefit to Debtor outside of the plan. There is no basis to hold that Debtor's actions constituted a prohibited transaction, so there is no basis to disqualify the Pensco IRA.

RES–GA relies upon *In re Williams,* 2011 WL 10653865 (Bankr.E.D.Cal.2011) in support of its position that Debtor engaged in prohibited transactions to render the IRA disqualified under section 408 and, therefore, not eligible for exemption. The *Williams* case presents similar facts because it also involves a Pensco self-directed IRA that owned real property. Yet, significantly, *Williams* involved a payment for services rendered. *Id.* at *4 (determining that payment for services was a prohibited transaction under 4975(c)(1)(C)). In *Williams,* the court explicitly found that the debtor engaged in work and services in which the Pensco-plan made payments. *Id.* at *5. The evidentiary record, here, simply does not support such a finding, and there is no evidence, in any form, of payment to Debtor or any of his wholly-owned entities in ex-change for the alleged work or services on the properties held by Pensco.

■ RES–GA also asserts that the Pensco IRA is disqualified based upon Debtor's early withdrawals. It asserts that the amount of the early withdrawals in this case underscores its position that such actions should be a disqualifying prohibited transactions. RES–GA again relies on the purported plain language of the statute in section 4975(c)(1)(D), yet the Court does not accept that the statute concludes that early withdrawals amount to a disqualifying prohibited transaction. The plain reading seems to suggest that once an early withdrawal is effectuated, this section is no longer applicable. Funds withdrawn from the plan no longer constitute "income or assets of a plan." *See Rollins v. Commissioner,* 2004 T.C.M. (RIA) 2004–260 at *9 (explaining that the assets of a 401(k) plan were not transferred to petitioner but instead used by the petitioner inside of the plan for petitioner's benefit). Additionally, it seems that the tax penalties associated with early withdrawals would be redundant if the entire IRA was deemed disqualified with any early withdrawal. The Court cannot make the leap that early withdrawals are akin to transactions where the interested party sits on both sides of a deal. *See e.g., Dep't of Labor Interpretive Bulletin* 75–2, 29 C.F.R. § 2509.75–2 (2004)(explaining that a common example of a prohibited transaction under I.R.C. § 4975(c)(1)(D) is when a plan invests in a corporation as part of an arrangement whereby it is expected that the corporation will engage in a transaction with a disqualified person).

Further, RES–GA argues that Debtor's premature withdrawals also fall within section 4975(c)(1)(E) and (c)(1)(F) to disqualify the Pensco IRA. Section 4975(c)(1)(E) is routinely referred to as prohibiting acts of

self-dealing, not merely make early withdrawals. The caselaw cited in support of this legal position is not persuasive. RES–GA relies on *In re Hughes*, 293 B.R. 528 (Bankr.M.D.Fla.2003), yet the *Hughes* case involved a loan from the debtor's IRA and does not present any ruling regarding whether an early withdrawal is a prohibited transaction. *Id.* at 530. Similarly, *Harris v. C.I.R.*, 67 T.C.M. (CCH) 1983 (T.C.1994) does not hold that premature withdrawals are prohibited transactions. Instead, *Harris*'s holding is regarding the taxability of the distribution. The tax court in *Harris* determined that "the $23,611 utilized from the IRA account is considered as having been distributed to petitioners and the taxability of the distribution is governed by the same rules which would apply if, in fact, the funds had actually been distributed to petitioners and invested by them in the retirement home." *Id.* RES–GA's argument is unpersuasive and it fails to meet its burden to disallow the Pensco IRA exemption.

RES–GA also asserted a theory that alleged work performed by Debtor's daughter on the Pensco-owned properties disqualified the IRA because she is a disqualified person. It is unclear whether RES–GA abandoned this theory, however, because there is no evidence of any relationship—work or otherwise—between Debtor's daughter and the Pensco IRA assets.

■ RES–GA's next main argument is that the Pensco IRA is disqualified and not eligible for exemption because of a purported co-ownership of a prepetition property by Debtor (or a wholly-owned LLC) and the Pensco IRA. RES–GA avers this co-ownership is also a prohibited transaction under section 4975(c)(1)(D) and (E)

because Debtor allegedly used IRA assets for his personal interest or benefit. The only evidence presented at the hearing regarding this alleged prohibited transaction is Debtor's testimony that he held a 55% interest in the respective property and the IRA held the remaining 45%. No documentary evidence of the transaction or ownership structure was presented. RES–GA asserts that this arrangement is a prohibited transaction because Debtor personally used or benefitted from the plan's interest in property. That position is unsupportive by the evidence, and RES–GA fails to meet its evidentiary burden of establishing that Debtor is not entitled to exempt the Pensco IRA under Georgia Code section 44–13–100(a)(2.1)(D).

■ The evidentiary record is inadequate to determine whether and how Debtor jointly-owned any real property with the Pensco IRA, yet there is testimony that RES–GA's lien attached to proceeds of the sale of this property, which resulted in an approximate payment of $75,000.00 to RES–GA. RES–GA's ability to use proceeds from this property to satisfy its lien or judgment seems to indicate that the property was not jointly held by Debtor and the Pensco IRA; rather there was apportioned ownership. Generically, joint tenancy provides equal, undivided right to the property by each owner.[7] The Court agrees that a true joint tenancy or tenancy in common may implicate a prohibited use of plan funds because of the undivided rights and nature of the ownership between a plan and co-owner. However, here, RES–GA's right to recover sale proceeds was only possible if Debtor owned a defined, apportioned piece of the property. Otherwise, RES–GA would have no access

---

7. *E.g., Georgia Farm Bureaus Mut. Ins. Co. v. Franks,* 320 Ga.App. 131, 135, 739 S.E.2d 427, 431 (2013).

to the property because the Pensco IRA would own an undivided interest in the property. RES–GA's actual recovery negates its position that the ownership structure of this property amounts to a prohibited transaction.

Based on the facts in the record, there is no evidence or viable theory that Debtor impermissibly benefitted from an apportioned purchase and resale of this property. Debtor's benefit was limited to his proportionate individual interest in the property and the plan maintained the benefit of its share of the property. It is instructive to the Court that the Department of Labor has determined, in another context, that an IRA may invest in a partnership. *Office of Pension and Welfare Benefit Programs,* Opinion No.2000–10A (E.R.I.S.A.) (July 27, 2000), 2000 WL 1094031 DOL. In a 2000 Department of Labor opinion, the IRA owner was the only general partner of a partnership that purchased the property. The IRA owned approximately 40% of the property and the IRA owner's general partnership interest was approximately 6% in the property. There was no prohibited transaction under section 4975(c)(1)(C), and the Department of Labor also stated that "a violation of section 4975(c)(1)(D) or (E) will not occur merely because the fiduciary derives some incidental benefit from the transaction involving IRA assets." *Id.*

The plain language of section 4975(c)(1)(D) and (E) refer to a disqualified person dealing and using plan assets for his own interest. The Court's statutory interpretation of the plain language does not conclude that apportioned ownership and resulting apportioned profit fall within these subsections of prohibited transactions. The Department of Labor ruling and the absence of any evidence regarding the terms and outcome of the purported undivided ownership in real property, do not allow the Court to conclude that apportioned ownership of real property is a *per se* prohibited transaction. As such, RES–GA has failed to meet its evidentiary burden to disqualify Debtor's Pensco IRA under section 408(a) of the Internal Revenue Code. RES–GA's motion to disallow Debtor's IRA exemption is denied.

### B. Debtor is not entitled to exempt the Annuity under Georgia Law.

■ Debtor also seeks to exempt the Annuity under section 44–13–100(a)(2.1)(D) of the Georgia Code. RES–GA and the Chapter 7 Trustee claim the Annuity is not exemptible as an individual retirement account under section 408 of the Internal Revenue Code. Debtor asserts that the Annuity falls within this Georgia exemption section and that the facts and circumstances surrounding the purchase of the Annuity show that it was intended for a substitute of wages and for retirement, and, therefore, is properly claimed as exempt.

The plain language of section 44–13–100(a)(2.1)(D) of the Georgia Code is ambiguous as to whether the exemption extends to all qualifying "individual retirement accounts," including an "individual retirement annuity" in section 408(b), or whether it is limited to an "individual retirement account" in section 408(a). Section 44–13–100(a)(2.1)(D) exempts "[t]he debtor's aggregate interest in any funds or property held on behalf of the debtor, and not yet distributed to the debtor, under any retirement or pension plan or system: (D) An individual retirement account within the meaning *Title 26 U.S.C. Section 408.*"

On one hand, the language of section 44–13–100(a)(2.1)(D) seems to limit its scope to an individual retirement account in section 408(a) of the Internal Revenue Code

because the statute uses the singular form of "individual retirement account," which is the term defined in section 408(a) and the statute uses "an" not "any." *See, e.g., In re Kemmerer,* 251 B.R. 50, 53 (8th Cir. BAP 2000) (interpreting the plural term "individual retirement accounts"). Alternatively, the term individual retirement accounts can be a catchall phrase that includes individual retirement annuities. *In re Miller,* 500 B.R. 578, 582 & n. 18 (8th Cir. BAP 2013) (questioning *In re Kemmerer* and quoting I.R.S. Pub. 590, *Individual Retirement Arrangements (IRAs)* (Jan. 30, 2013) at 3 ("[A] traditional IRA can be an individual retirement account or annuity.")).

Although the language of the Georgia statute could have been more clear by specifying the applicable section or sections of 408, a determination as to whether a section 408(b) qualified individual retirement annuity could fall within section 44–13–100(a)(2.1)(D) of the Georgia Code is not necessary under these facts and circumstances. Here, the Annuity is not eligible for exemption under section 408 of the Internal Revenue Code because Debtor funded this Annuity with contributions or premiums that exceed the annual statutory maximums under both sections 408(a) and (b), so the Annuity is disqualified regardless of the scope of the Georgia Code section at issue.[8]

**8.** § 408. Individual retirement accounts

(a) Individual retirement account.—For purposes of this section, the term "individual retirement account" means a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries, but only if the written governing instrument creating the trust meets the following requirements:

(1) Except in the case of a rollover contribution described in subsection (d)(3) in section 402(c), 403(a)(4), 403(b)(8), or 457(e)(16), no contribution will be accepted unless it is in cash, and contributions will not be accepted for the taxable year on behalf of any individual in excess of the amount in effect for such taxable year under section 219(b)(1)(A).

(2) The trustee is a bank (as defined in subsection (n)) or such other person who demonstrates to the satisfaction of the Secretary that the manner in which such other person will administer the trust will be consistent with the requirements of this section.

(3) No part of the trust funds will be invested in life insurance contracts.

(4) The interest of an individual in the balance in his account is nonforfeitable.

(5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.

(6) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.

(b) Individual retirement annuity.—For purposes of this section, the term "individual retirement annuity" means an annuity contract, or an endowment contract (as determined under regulations prescribed by the Secretary), issued by an insurance company which meets the following requirements:

(1) The contract is not transferable by the owner.

(2) Under the contract—

(A) the premiums are not fixed,

(B) the annual premium on behalf of any individual will not exceed the dollar amount in effect under section 219(b)(1)(A), and

(C) any refund of premiums will be applied before the close of the calendar year following the year of the refund toward the payment of future premiums or the purchase of additional benefits.

(3) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of the owner.

(4) The entire interest of the owner is nonforfeitable.

Such term does not include such an annuity contract for any taxable year of the owner in which it is disqualified on the application of subsection (e) or for any subsequent taxable year. For purposes of this subsection,

Assuming section 408(b) applies to Georgia Code section 44–13–100(a)(2.1)(D), to qualify as an "individual retirement annuity" under Section 408(b), the "annual premium on behalf of any individual [may] not exceed the dollar amount in effect under section 219(b)(1)(A)." 26 U.S.C. § 408(b)(2)(B). The dollar amount in effect for the taxable year 2003 was $3,000. 26 U.S.C. § 219(b)(5). As such, the Debtor's 2003 contributions to the Annuity in the amount of $250,000 and $100,000 greatly exceed the statutory prescribed limit. *In re Ludwig*, 345 B.R. 310, 317 (Bankr. D.Colo.2006) (disallowing debtor's claimed annuity exemption because, in part, the annuity exceeded the annual contribution limit); *In re Rogers*, 222 B.R. 348, 351 (Bankr.S.D.Cal.1998) (holding that lump sum premium payment for debtor's annuity contract "far exceeded" former $2,000 limit under a previous version I.R.C. § 408(b)(2)(B)); *see In re Bogue*, 240 B.R. 742, 746 (Bankr.E.D.Wis.1999) (explaining that single premium deferred annuity contracts that exceed the annual contribution limit do not qualify as an individual retirement annuity under I.R.C. § 408(b)).

Debtor argues that the Annuity's terms provide for no annual premium, so that the section 219(b)(1)(A) premium limitation is not applicable. Yet the terms of

the Annuity cannot obviate the qualifying requirements under section 408 of the Internal Revenue Code. The limitations on contributions are an integral part of the Internal Revenue Code, Georgia's exemptions, and the Bankruptcy Code's exemption scheme. Debtor does not advance any theory that the premium limits prescribed in section 408(b) have been satisfied by the Annuity. Section 408(a) also imposes annual premium limits. 26 U.S.C. § 408(a)(1). Therefore, any theory qualifying the Annuity under section 408 of the Internal Revenue Code fails.

Although the amount of Debtor's contributions disqualify the Annuity under section 408 of the Internal Revenue Code, RES–GA also asserts additional grounds to disqualify the Annuity.[9] It is not necessary to rule on these issues, however, since the Annuity is disqualified based upon Debtor's excessive contributions to the Annuity.

Debtor urges the Court to consider Debtor's subjective intent when purchasing and making contributions to the Annuity to determine whether the Annuity may be properly exempted. Debtor argues that there is sufficient evidence to establish the three-pronged test recently set

---

no contract shall be treated as an endowment contract if it matures later than the taxable year in which the individual in whose name such contract is purchased attains age 70½; if it is not for the exclusive benefit of the individual in whose name it is purchased or his beneficiaries; or if the aggregate annual premiums under all such contracts purchased in the name of such individual for any taxable year exceed the dollar amount in effect under section 219(b)(1)(A).

26 U.S.C. § 408(a) & (b).

9. Specifically, RES–GA asserts that the Annuity includes an impermissible life insurance component and that the Annuity is forfeitable. Section 408(a)(3) of the Internal Revenue

Code states that an IRA cannot have trust funds invested in life insurance contracts. There is no evidence that the Annuity invests in a life insurance contract, yet Debtor did select an incidental death benefit rider for this Annuity. Further, an individual retirement annuity in section 408(b) of the Internal Revenue Code explicitly contemplates an incidental death benefit. 26 U.S.C. § 408(b)(3). The Annuity's value as a death benefit exceeds its cash value, and the legal implications of this product structure remain unanswered by this opinion. The forfeitability issue is discussed below but is not a basis for holding the Annuity is disqualified under section 408 of the Internal Revenue Code.

forth by the Georgia Supreme Court in *Silliman v. Cassell:*

> To be exempt under this provision [O.C.G.A. § 44–13–100(A)(2)(E) ], the ... annuity must meet three requirements: (1) it must be an annuity; (2) the right to receive the annuity payments must be "on account of illness, disability, death, age, or length of service"; and (3) the payments must be reasonably necessary to support [debtor] or her dependents.

*Silliman v. Cassell,* 292 Ga. 464, 466, 738 S.E.2d 606 (2013). This is the test for an exemption claimed under a different exemption subsection and not relevant to the determination before the Court. Any policy reason Debtor attempts to inject from *Silliman v. Cassell* is not applicable to the statute under which Debtor claims his Annuity exemption. Further, there are material factual distinctions from this action and those in *Silliman v. Cassell.* Specifically, the debtor in *Silliman v. Cassell* was already receiving annuity payments at the time of the bankruptcy filing, so any issues regarding the debtor's right to future payments or the ability to exempt the annuity's corpus were not involved.

Nevertheless, *Silliman v. Cassell* affirms that not all annuity products qualify as exempt under the Bankruptcy or Georgia Code. The pertinent inquiry under section 44–13–100(A)(2)(E) of the Georgia Code is whether the annuity provides a substitute for wages. *Silliman v. Cassell,* 292 Ga. at 466, 738 S.E.2d 606. Courts are instructed to consider the nature of the contract and the facts and circumstances surrounding its purchase. *Id.* at 466, 738 S.E.2d 606. The terms of this Annuity and the evidence presented to the Court do not establish that the Annuity provides a substitute for wages. In fact, the evidence indicates that this Annuity could be used to supplement or replace wages, yet it also serves as a flexible investment vehicle for Debtor. It seems Debtor intends and needs the Annuity funds now based upon his testimony regarding his current financial hardship. This Annuity product also allows Debtor to withdraw funds or terminate the contract to access the funds at any time, subject to penalties. RES–GA's Exhibit 13 ("AXA Annuity"), §§ 5.01–5.03. Therefore, the primary factor—of whether the annuity acts as a substitute for wages—in *Silliman v. Cassell* also cuts against Debtor's argument to exempt the Annuity to some extent.

■ Additionally, as this Court previously discussed in *In re Michael,* 339 B.R. 798, 805 (Bankr.N.D.Ga.2005), investment products named "annuity" do not automatically equate to exemptible annuities under the Bankruptcy or Georgia Codes. The analysis from *Michael* regarding whether a claimed annuity is actually an annuity contract is relevant to Debtor's intent theory. The level of control and options under this Annuity is very similar to the annuity analyzed and determined to be nonexempt in *In re Michael.*[10] In *Michael,* the annuity allowed the debtor "at any time during her lifetime, to assign the Contract or surrender it in whole or in part; amend or change the Contract; exercise any right and receive any benefit under the Contract; and make additional purchase payments into the fund." *Id.* In summary, this Court found that the annuity contract in *Michael* was "closer in resemblance to other types of tax-deferred investments such as savings accounts and bonds than retirement investments." *Id.* at 806. This Annuity is not assignable, yet

---

10. In *Michael,* the Debtor attempted to exempt the annuity under O.C.G.A. § 44–13–100(a)(2.1)(C), rather than subsection (D). The analysis as to whether the annuity is a contract subject to exemption remains relevant.

Debtor has the ability to transfer it to alternative investments, withdraw funds at any time and at any amount, which would result in termination of the Annuity, and be subject to a applicable tax penalties. AXA Annuity, §§ 4.01–4.02, 5.01–5.03. Additionally, Debtor has the ability to change the maturity date and the payment intervals. *Id.* at 7.01, 7.03.

The terms of this Annuity are also similar to the non-exempt annuity analyzed in *In re Bramlette,* 333 B.R. 911, 921 (Bankr. N.D.Ga.2005). In *Bramlette* the Court noted that the annuity "was not a contract to provide benefits in lieu of earnings after retirement or a plan created to fill or supplement a wage or salary void" because the debtor had only made one contribution to the annuity, had discretion to withdraw from the corpus, and currently has the option to decide at a later time to receive a fixed return on her investment. *Id.* The Annuity, here, offers the same investment options to Debtor, and the evidence seems to support that investment was the primary purpose Debtor obtained the Annuity and how he seeks to use the available funds in it.

Unfortunately for this Debtor, his well-intentioned investment in this Annuity does not make it available for exemption. Bankruptcy's fresh start goal includes exemptions "to provide [the debtor] with the basic necessities of life so that even if his creditors levy on all of his nonexempt property, the debtor will not be left destitute and a public charge." H.R. Rep. No. 95–595, at 126 (1978), 1978 U.S.C.C.A.N. 5963, 6087. However, this gift to a debtor is limited so that a return to a debtors' creditors is also maximized. The Supreme Court recently explained (in a different context) that "[t]he Code limits exemptions in this fashion because every asset the Code permits a debtor to withdraw from the estate is an asset that is not available

to his creditors." *Schwab v. Reilly,* 560 U.S. 770, 791, 130 S.Ct. 2652, 2667, 177 L.Ed.2d 234 (2010). The Supreme Court also commented that overextending exemptions would effectively convert the concept of a fresh start to a "free pass." *Id.* Here, the Annuity is not eligible for exemption under section 44–13–100(a)(2.1)(D) of the Georgia Code because the Annuity is not a qualified individual retirement account, in the generic or specific term, under section 408 of the Internal Revenue Code.

## CONCLUSION

For the reasons discussed above, the Court overrules RES–GA's objection to Debtor's Pensco IRA exemption and sustains RES–GA's and the Trustee's objection to the Annuity. Accordingly, it is

**ORDERED** that RES–GA's Motion to Disallow Exemptions is **GRANTED** in part and **DENIED** in part (Docket Nos. 22 & 70).

It is **FURTHER ORDERED** that the Chapter 7 Trustee's Objection to Exemption is **SUSTAINED** (Docket Nos. 56).